IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Helen Koliner, *et al.*,

   Plaintiffs,

 v.

Seale A. Moorer, Jr., *et al.*,

   Defendants.

Case No: 2:19-cv-1999

Judge Graham

Chief Magistrate Judge Deavers

## Opinion and Order

  Plaintiffs are 15 former employees of business entities allegedly owned and controlled by defendant Seale A. Moorer, Jr.  Plaintiffs allege that they are owed various forms of compensation, including salary, health benefits, severance pay and pension contributions, which were not paid after Moorer and his companies experienced financial difficulties in 2018.  Moorer's control over the companies allegedly ended in January 2019.

  This matter is before the court on the joint motion to dismiss filed by defendants Nomadix, Inc. and Gate Worldwide Holdings, LLC (GWH).  Nomadix was a subsidiary among Moorer's group of companies.  GWH is an outside company which allegedly obtained control over Moorer's companies in 2019.  For the reasons that follow, the motion to dismiss is granted.

**I. Background**

  **A. Defendant Moorer and his Business Entities**

  Defendant Seale A. Moorer, Jr., resides in Delaware, Ohio.  The complaint alleges that he owned and controlled numerous companies that were located in the United States, Europe and Asia.  The companies provided Internet and entertainment services for the hospitality industry in the United States and internationally.  The services included supplying wireless networks, mobile platforms, televisions, and hardware and software to hotel chains.

   **1. ST Holdings**

  Moorer directly owned ST Holdings Topco, LLC, which was the company at the top of the corporate structure and which had its headquarters in Westerville, Ohio.  ST Holdings Topco owned

1

ST Holdings, LLC.  Two lines of companies were owned by ST Holdings.  The first line is referred to as the InterTouch branch; the second as the Quadriga/Exceptional Innovation ("EI") branch.

### 2. The InterTouch branch

ST Holdings, LLC owned InterTouch Topco, LLC, which in turn owned InterTouch Holdings, LLC.  InterTouch Holdings owned two companies: defendant InterTouch Pte Ltd. and defendant Nomadix Inc.

Defendant InterTouch Pte Ltd. was based in Singapore and allegedly functioned as the primary operating company for the entities in the InterTouch branch.  It entered into contracts and serviced the hospitality industry.

Defendant Nomadix had its principal place of business in California.  It developed and licensed network gateway equipment and software for the hospitality industry.  Nomadix allegedly held a substantial intellectual property portfolio.

### 3. The Quadriga/EI branch

ST Holdings, LLC also owned Exceptional Innovation Intermediate BV, which in turn owned three companies: SmarTV Co., Exceptional Innovation, Inc., and Exceptional Innovation, BV.  The latter entity, Exceptional Innovation BV, owned Quadriga Holdings Ltd, whose subsidiaries were Quadriga Americas, LLC and Quadriga Worldwide Ltd.  According to the complaint, the Quadriga/EI branch companies were based in Europe and the United States.

### 4. Moorer's Plans to Consolidate

The complaint alleges that Moorer intended to streamline the functions of his various companies.  To that end, the operations of the companies allegedly became commingled. InterTouch Holdings, LLC and Exceptional Innovation, Inc. shared headquarters with the ST Holdings Topco headquarters in Westerville.  In 2017, Moorer instituted a reduction in staff and consolidation of business operations.  In mid-2018, Moorer announced that the InterTouch branch and the Quadriga/EI branch would operate under the brand name of the IQ Group.[1]

According to the complaint, employees of Moorer's companies were treated as "shared employees."  Compl., ¶ 41.  Employees in the Quadriga/EI branch, for instance, "performed website and market branding" services for InterTouch Holdings and Nomadix.  *Id.*, ¶ 45.  Nomadix

---

[1] The complaint does not allege that Moorer formed a separate corporate entity called the IQ Group.  Nor does the complaint allege that his companies merged with one another, such that they would have lost their corporate separateness.

2

employees managed the intellectual property of Exceptional Innovation, Inc. and Quadriga Worldwide.

### B. Plaintiffs

Plaintiffs are 15 individuals who were employees of companies in the Quadriga/EI branch. Ten of them were employed by Exceptional Innovation, Inc., while the rest were employed by either Exceptional Innovation, BV, Quadriga Americas or Quadriga Worldwide. Plaintiffs were employed at senior or management level capacities, such as vice presidents, officers and directors. Some of the plaintiffs were contract employees, while others were at-will.

The complaint alleges that plaintiffs routinely performed work for entities which were not their direct employers. This followed from the practice of "shared employees" among Moorer's companies. For example, plaintiff Helen Koliner was employed by Exceptional Innovation BV as General Legal Counsel. She worked under the direction of Moorer and Exceptional Innovation Inc., and she performed legal work for entities of both the InterTouch branch and the EI/Quadriga branch. Her salary was paid from SmarTV and Quadriga Americas accounts.

As another example, plaintiff James Naro was Chief Commercial Officer of Exceptional Innovation, Inc. He provided services to entities in the EI/Quadriga branch and to entities in the InterTouch branch, including serving for a time as the Chief Executive Officer of InterTouch Pte. Naro also served on the board of directors of Nomadix and Quadriga Worldwide. His salary was paid through a SmarTV account.

And as a final example, plaintiff Rick Swift was employed by Quadriga Worldwide as Senior Vice President. He provided services for not only Quadriga Worldwide but also for InterTouch entities. His salary was paid through a SmarTV account.

### C. Disruptions to Payroll and Health Insurance Coverage

In late 2017, employees of entities in the InterTouch and Quadriga/EI branches began experiencing disruptions in the direct deposit payment of their payroll checks. Moorer allegedly falsely communicated that the disruptions were caused by computer glitches, when cash flow problems were the true cause. Several more disruptions followed in 2018, but Moorer told employees that their jobs and paychecks were secure.

In June 2018, Moorer issued a press release announcing that Exceptional Innovation, Inc. had secured a capital investment of $75 million from Tiller Capital. This announcement was communicated to employees, allegedly as a means to assure them of the financial soundness of

3

Moorer's companies. However, Moorer did not disclose that the investment had not been finalized and was contingent upon other events.

In July 2018, the payment of salaries was again interrupted. Moorer falsely communicated that the Tiller Capital investment had been completed and that payment of salaries was imminent. This cycle – of delay in paying salaries followed by allegedly false assurances by Moorer concerning the Tiller Capital investment – continued into October 2018.

In November 2018, direct deposit of payroll ceased and paychecks were issued manually. Moorer again indicated that financing from Tiller Capital was forthcoming. He did not disclose to employees that InterTouch Topco LLC and InterTouch Holdings LLC were filing for Chapter 11 bankruptcy.

In December 2018, Moorer circulated an email to employees stating that funds from the Tiller Capital investment would soon be available. According to the complaint, Moorer knew by that point that the Tiller Capital investment would not be consummated.

At about the same time, employees began discovering that their health insurance claims had been denied on the grounds that there was no insurance. The complaint alleges that Moorer's companies had failed to pay premiums to employees' health insurance carriers. One of the health insurance carriers, Anthem, mailed employees a notice stating that that they lacked coverage for November and December 2018.

### D. Defendant Gate Worldwide Holdings

GWH is a privately-held investment company based in New York. The complaint traces GWH's involvement with Moorer's companies back to a 2015 corporate acquisition.

Moorer formed InterTouch Holdings, LLC in 2015 as a holding company for the anticipated acquisition of defendants InterTouch Pte and Nomadix. In connection with the acquisition, InterTouch Holdings executed a promissory note held by NTT Docomo. Pledged as collateral was equity in InterTouch Pte and Nomadix. In connection with InterTouch's obligations under the note, ST Holdings executed a guarantee in which it pledged its voting rights in Exceptional Innovation Intermediate BV.

NTT Docomo at some point assigned the promissory note and guarantee to GWH. The note balance at the time was about $50 million.

In September 2017 GWH declared a default on the note. It filed suit in New York state court in 2018, which led to a court-supervised sale in the fall of 2018 in which GWH was the sole bidder and was poised to take ownership of InterTouch Holdings LLC. But prior to the court

4

approving the sale, Moorer caused InterTouch Topco LLC and InterTouch Holdings LLC to file for Chapter 11 bankruptcy in Delaware. This brought a stay to the state court action.

On January 10, 2019, the bankruptcy court dismissed the Chapter 11 petition of InterTouch Topco LLC and InterTouch Holdings LLC as being a matter which was inappropriate for bankruptcy.

With the bankruptcy petition dismissed, the New York state court quickly confirmed the sale of InterTouch Holdings LLC, including subsidiaries InterTouch Pte and Nomadix, to GWH.

The complaint alleges that GWH also acquired voting rights under the ST Holdings' guarantee. GWH allegedly exercised these rights to exert influence over Exceptional Innovation Intermediate BV and, with it, all of the Quadriga/EI branch. On January 15, 2019, GWH sent armed guards and attorneys to the Westerville headquarters. They removed Moorer from the premises and took custody of computer servers. Compl., ¶ 10. GWH removed other key personnel and installed its own managing partner as the new CEO of Exceptional Innovation Intermediate BV. *Id.*, ¶¶ 137-140.

GWH retained, as independent contractors, a small number of employees who had worked at the Westerville headquarters. Outside of these individuals, U.S.-based former employees of Moorer's companies were cut off from employment. *Id.*, ¶ 142. According to the complaint, GWH did not communicate with the employees or notify them that they were no longer employed. Rather, on January 22, 2019, employees discovered that their access to employee email, systems and accounts had been eliminated.

Plaintiffs and other former employers received "corrected W-2" tax forms in February 2019 indicating that they received no compensation for the final pay period in 2018. Plaintiffs allege that they worked during the final pay period in 2018, as well as the first pay period of 2019.

Plaintiffs and other employees also received notice that no employer contributions had been made to 401(k) plans after November 10, 2018.

The complaint alleges that once GWH tool control of Moorer's companies, it knowingly chose not to compensate plaintiffs for amounts due them and instead directed available funds towards other expenditures.

In February 2019, GWH exercised its voting rights to force Exceptional Innovation, Inc. to liquidate through a Chapter 7 bankruptcy proceeding. This occurred despite GWH allegedly knowing that Exceptional Innovation, Inc. was owed millions of dollars by InterTouch Pte for services that the employees of Exceptional Innovation, Inc. had provided to InterTouch Pte. GWH

also caused Quadriga Worldwide to enter into an insolvency proceeding in the United Kingdom in February 2019.

### E. Plaintiffs file this Lawsuit

Plaintiffs filed this action against Moorer, InterTouch Pte, Nomadix and GWH. Against Moorer, the complaint asserted claims for fraud and for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1343, and the Employee Retirement Income Security Act, 29 U.S.C. §§ 1109, 1132.

Against all defendants, the complaint asserted a claim for breach of express or implied employment contracts. Plaintiffs allege that they are entitled to compensation for unpaid and unreimbursed salary, pension contributions, health benefits, vacation and leave benefits, business expenses and severance pay.

Plaintiffs have voluntarily dismissed, without prejudice, their claims against defendants Seale Moorer and InterTouch Pte Ltd. *See* Doc. 26.

This matter is now before the court on the joint motion to dismiss filed by Nomadix and GWH.

## II. Standard of Review

Federal Rule of Civil Procedure 8(a) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a motion under Rule 12(b)(6) to dismiss a pleading for failure to state a claim, a court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court should construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. *Iqbal*, 556 U.S. at 679; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Twombly*, 550 U.S. at 555-56.

Despite this liberal pleading standard, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555, 557 ("labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do," nor will "naked assertion[s]" devoid of "further factual enhancements"); *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (a court is "not bound to accept

6

as true a legal conclusion couched as a factual allegation"). The plaintiff must provide the grounds of his entitlement to relief "rather than a blanket assertion of entitlement to relief." *Twombly*, 550 U.S. at 556 n.3. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

When the complaint does contain well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Though "[s]pecific facts are not necessary," *Erickson*, 551 U.S. at 93, and though Rule 8 "does not impose a probability requirement at the pleading stage," *Twombly*, 550 U.S. at 556, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. *Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 555-56. This inquiry as to plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]'– 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### III. Discussion

#### A. Plaintiffs' Claims against Nomadix

Nomadix argues that the claims for breach of an employment contract must be dismissed because it did not have a contractual relationship with plaintiffs. None of the 15 plaintiffs were employed by Nomadix. According to the complaint, all of the plaintiffs were employed by companies in the Quadriga/EI branch.

Plaintiffs acknowledge that they did not have a direct employment relationship with Nomadix. They instead argue that Nomadix was a "joint employer" by virtue of the way in which Moorer caused employees of his companies to be shared. Plaintiffs assert that they performed work for Nomadix for which they should be compensated.

The concept of joint employer liability is not well-developed in Ohio. *See Wittenbrook v. Elecs. Recycling Servs., Inc.*, 2018-Ohio-208, ¶ 27, 104 N.E.3d 876, 882 (Ohio Ct. App. 2018) ("The concept of joint employer liability has not been discussed at length in Ohio case law."). "As a general matter,

it is a judicially-created doctrine that can be used to impose liability on one business enterprise for the employment actions of a related or subsidiary enterprise." *Id.* Ohio courts have borrowed from federal law on the matter, which has been developed in the context of federal labor statutes.[2] *Id.* (citing *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997)).

Plaintiffs recognize that "the key" to their theory is control – Nomadix is required to have had "'control, in the capacity of employer, [over] the labor relations of a given group of workers.'" Doc. 21 at PAGEID 145 (quoting *N.L.R.B. v. Condenser Corp. of Am.*, 128 F.2d 67, 72 (3d Cir. 1942)). "'[T]wo entities may be considered a single joint employer if, upon review of their intercorporate relationship, one exercises a degree of control that exceeds the control normally exercised by a parent corporation over its separate and distinct subsidiary corporation.'" *Wittenbrook*, 104 N.E.3d at 882 (quoting *Wilmot v. Forest City Auto Parts*, No. 75945, 2000 WL 804616, at *3 (Ohio Ct. App. June 22, 2000)). *See also Sanford v. Main St. Baptist Church Manor, Inc.*, 449 Fed. App'x 488, 491 (6th Cir. 2011) ("The joint-employer doctrine involves a business that maintains sufficient control over some or all of the formal employees of another business as to qualify as those employees' employer.").

"Entities are joint employers if they 'share or co-determine those matters governing essential terms and conditions of employment.'" *E.E.O.C. v. Skanska USA Bldg., Inc.*, 550 Fed. App'x 253, 256 (6th Cir. 2013) (quoting *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir. 1985)). In determining if an entity is the plaintiff's joint employer, a court looks to "an entity's ability to hire, fire or discipline employees, affect their compensation and benefits, and direct and supervise their performance." *Id.*

The court finds that the complaint fails to sufficiently allege that Nomadix exercised the type of control over any of the plaintiffs to qualify as a joint employer. Plaintiffs allege that Moorer

---

[2] At this stage, Nomadix does not raise the issue of whether the joint employer doctrine, which courts use to evaluate liability under federal labor statutes (such as the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Fair Labor Standards Act, the Labor Management Relations Act, and Title VII), can be applied to a common law breach of employment contract action. The court need not address this issue because the court finds that the complaint fails to sufficiently allege the requisite element of control for purposes of joint employer liability.

The court also notes the existence of a related concept known as "single employer" liability for integrated enterprises. *See Perkins v. Am. Spotting Co. of Ohio, Inc.*, No. 2:18-CV-54, 2018 WL 7358598, at *2 n.2 (S.D. Ohio Dec. 13, 2018) (contrasting the single employer and joint employer doctrines). Plaintiffs state that Moorer's companies, although related and controlled by him, were "were formally separate corporate entities" and thus argue that the joint employer analysis, not the single employer analysis, applies. Doc. 21 at PAGEID 145-46.

controlled all of his companies, which were interrelated and which had a practice of sharing employees. But these assertions, taken as true, do not support an inference that Nomadix controlled plaintiffs' employment. The complaint alleges that it was Moorer, not Nomadix, who dominated and controlled his companies and plaintiffs' employment relationships.

The complaint asserts that Moorer treated his companies as his alter egos. Compl. ¶ 1. It alleges that Moorer "had the final say" on major decisions, and that with respect to "financial matters in particular and significant decisions on other matters nothing could be done without Defendant Moorer's input or approval." *Id.*, ¶¶ 149, 153(f). Further, Moorer "unilaterally allocated business among entities" and "unilaterally moved funds" among his entities. *Id.*, ¶¶ 153(g), (i). Moorer "made all employment decisions" concerning "executives of all the entities" and even "controlled and exercised approval over somewhat lower-level personnel." *Id.*, ¶ 153(m). He allegedly "micromanaged . . . the terms and conditions of his higher-level employees." *Id.*, ¶ 153(o).

Plaintiffs, who were executives and higher-level employees of Moorer's companies, do not allege that Nomadix controlled the terms and conditions of their employment. Nor do they allege that Nomadix had the authority to hire, fire, promote or discipline plaintiffs, or that Nomadix affected plaintiffs' compensation and benefits or managed their job responsibilities. According to the complaint, plaintiffs "were supervised by superiors or managers" at the Westerville headquarters for ST Holdings Topco and Exceptional Innovation, Inc. Compl., ¶ 7. Nomadix, meanwhile maintained its offices in California. *Id.*, ¶ 32. Plaintiffs further allege that they were paid or had their benefits compensated by entities within the Quadriga/EI branch. *Id.*, ¶¶ 15-29. Nomadix, however, was in the InterTouch branch.

The complaint alleges that plaintiffs may have sometimes performed work which benefitted Nomadix. According to the complaint, Moorer's insistence on the practice of sharing employees meant that all of his companies received the benefit of plaintiffs' work. Compl., ¶¶ 40-41. The complaint provides a few examples. Employees of Exceptional Innovation, Inc. provided "website and market branding" services to InterTouch Holdings and its subsidiaries, including Nomadix. *Id.*, ¶ 45. Employees of Exceptional Innovation, BV provided "legal and contracting" services to IQ Group entities, including Nomadix. *Id.*, ¶ 47. But plaintiffs do not allege that Nomadix controlled their employment; rather, it was Moorer who required that they perform work which benefitted the various IQ Group entities.

The complaint makes a handful of allegations which link certain plaintiffs to Nomadix. Plaintiff Michael McCarron, Vice President of Financial Planning and Analysis at Exceptional

9

Innovation, Inc., was directed by Moorer to establish annual budgets for four entities, including Nomadix. Compl., ¶ 18. Plaintiff Scott Akesson, Vice President of Systems and Network Engineering at Exceptional Innovation, Inc., was "used by Moorer" to handle equipment issues for Nomadix during a move of headquarters. *Id.*, ¶ 20. Plaintiff Shane Pierce, President of Exceptional Innovation, Inc., helped instruct Nomadix sales representatives on selling a computer platform. *Id.*, ¶ 28. Though these plaintiffs may have occasionally performed work for Nomadix's benefit and may have received direction from someone at Nomadix on how to perform a certain task, *see* Compl., ¶ 50, the complaint fails to allege that Nomadix exerted significant control over them or determined the terms and conditions of their employment. *See N.L.R.B. v. Browning-Ferris Indus. of Pennsylvania, Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982) (holding that joint employer situation exists only when "two or more employers exert significant control over the same employees . . . [where] they share or co-determine those matters governing essential terms and conditions of employment").

In sum, because Nomadix is not alleged to have exercised the type of control over plaintiffs sufficient to make it a joint employer, the breach of employment contract claims against Nomadix are dismissed.

### B. Plaintiffs' Claims against Gate Worldwide Holdings

Plaintiffs have also asserted claims for breach of an employment contract against GWH. Plaintiffs acknowledge that GWH was not their direct employer and that they had no employment contract with GWH. Plaintiffs' theory is that GWH is a successor corporation which is liable for the obligations of plaintiffs' direct employers.

In general, "the purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation." *Welco Indus., Inc. v. Applied Cos.*, 67 Ohio St.3d 344, 346-47, 617 N.E.2d 1129, 1132 (Ohio 1993); *see also Travis v. Harris Corp.*, 565 F.2d 443, 446 (7th Cir. 1977) ("As a general rule, a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities.").

There are four exceptions to the general rule: "(1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a *de facto* consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability." *Welco*, 67 Ohio St.3d at 347, 617 N.E.2d at 1132.

Plaintiffs contend that the second exception applies. In a merger, "the surviving corporation and the merged corporation are one and the same" for liability purposes. *Anspec Co. v. Johnson*

*Controls, Inc.*, 922 F.2d 1240, 1244-45 (6th Cir. 1991) (explaining that the surviving company stands in the shoes of the merged corporation).

A *de facto* merger is "a transaction that results in the dissolution of the predecessor corporation and is in the nature of a total absorption of the previous business into the successor." *Welco*, 67 Ohio St.3d at 349, 617 N.E.2d at 1134. It is a "merger in fact without an official declaration of such." *Id.*

The "hallmarks" of a *de facto* merger include "(1) the continuation of the previous business activity and corporate personnel, (2) a continuity of shareholders resulting from a sale of assets in exchange for stock, (3) the immediate or rapid dissolution of the predecessor corporation, and (4) the assumption by the purchasing corporation of all liabilities and obligations ordinarily necessary to continue the predecessor's business operations." *Id.* The *sine qua non* of a *de facto* merger is the transfer of the selling company's assets for stock in the acquiring company. *Id.*

The complaint alleges that GWH was assigned a promissory note under which InterTouch Holdings pledged equity in InterTouch Pte and Nomadix. The complaint further alleges that GWH was assigned a guarantee by which ST Holdings pledged voting rights in Exceptional Innovation Intermediate BV. When InterTouch defaulted and ST Holdings did not perform the guarantee, GWH brought suit in New York state court and ultimately obtained a judgment in its favor. GWH obtained the assets of InterTouch Holdings and the voting rights of ST Holdings.

Plaintiffs argue that GWH's purchase of InterTouch Holdings, combined with its acquisition of voting rights in Exceptional Innovation Intermediate BV, enabled GWH to exert control over Moorer's companies and effected a *de facto* merger.

The court finds, however, that the complaint's allegations fail to support a plausible inference that GWH accomplished a *de facto* merger with the companies which directly employed plaintiffs. GWH is not alleged to have purchased the assets of any of plaintiffs' direct employers, which were Exceptional Innovation, Inc., Exceptional Innovation, BV, Quadriga Americas and Quadriga Worldwide. Rather, GWH acquired the assets of InterTouch Holdings, in a court-approved sale that was not alleged to have been conditioned on GWH assuming the liabilities of any of Moorer's companies. As alleged in the complaint, GWH's acquisition of InterTouch Holdings was an assets-for-cash sale – the very sort of corporate transaction for which the general rule against successor liability applies.

Recognizing that a pure assets-for-cash transaction does not create successor liability, plaintiffs argue that GWH's acquisition of voting rights in the parent company of plaintiffs' direct employers is the additional factor which qualifies this case as an exception to the general rule. The court disagrees.

Again, GWH acquired assets in InterTouch Holdings, not in plaintiff's employers. But even putting that aside, the complaint fails to allege that Moorer or any of his entities received stock in GWH as part of the dealings. In a *de facto* merger, "[c]ontinuity of ownership is key." *Garrett Day, LLC v. Int'l Paper Co.*, No. 3:15-cv-36, 2019 WL 1331680, at *9 (S.D. Ohio Mar. 25, 2019); *see also State ex rel. Health Care Facilities, Inc. v. Ohio Bureau of Workers' Comp.*, 80 Ohio St.3d 642, 648, 687 N.E.2d 763, 768 (Ohio 1998). "[C]onsideration must be stock of the acquiring corporation. Such stock transfers supply that crucial characteristic of a merger to an asset sale – continuity of shareholder interest from the selling corporation to the acquiring corporation." *Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 447, 244 N.W.2d 873, 891 (Mich. 1976) (Coleman, J., dissenting); *see also Welco*, 67 Ohio St.3d at 349, 617 N.E.2d at 1134. The complaint does not allege that GWH exchanged its own stock as consideration when it purchased the assets of InterTouch Holdings or the pledge of voting rights in Exceptional Innovation Intermediate BV. None of the stockholders of the entities involved, including plaintiffs' direct employers, became a part of GWH.

Other hallmarks of a *de facto* merger are absent. The complaint does not allege continuity in the management, personnel and location of the entities involved. *See Cytec Indus., Inc. v. B.F. Goodrich Co.*, 196 F.Supp.2d 644, 658 (S.D. Ohio 2002) (citing 15 William Meade Fletcher *et al.*, *Fletcher Cyclopedia of the Law of Private Corporations* § 7045.10 (perm. ed., rev. vol. 1990)). The complaint alleges that GWH forcibly removed Moorer, put its own executives in charge, eliminated the employment of plaintiffs and other employees, and ran its operations from a different location. *See* Compl., ¶¶ 10, 11, 31, 137-38, 140. GWH "banished employees with fiduciary duties" and "excluded" members of Moorer's former management team "from any ongoing role." *Id.*, ¶¶ 138, 140. Rather than absorb the entities which employed plaintiffs, GWH is alleged to have forced them out of business. After removing management and employees, GWH allegedly caused Exceptional Innovation, Inc. (which had already ceased operations under Moorer, *see* Compl., ¶ 9) and Quadriga Worldwide to file for bankruptcy.

The court therefore finds that the complaint fails as a matter of law to allege successor liability against GWH for the alleged breaches of contracts committed by plaintiffs' direct employers.[3]

### C. Third-Party Beneficiary Theory

In their response brief to the motion to dismiss, plaintiffs argue that they were third-party beneficiaries to "contractual relationships between corporate entities." Doc. 21 at PAGEID 149. Their argument is undeveloped and is placed in the middle of the brief's discussion of successor liability. Plaintiffs appear to argue that Moorer's companies paid each other for the services one company would provide to another. *See id.* at PAGEID 151 (alleging that when a "direct employer assigned [plaintiffs] to provide services" for another entity, the other entity paid for the services). Plaintiffs contend that they were beneficiaries to the payment arrangements which existed among the entities.

This argument is unavailing for several reasons. Chiefly, these allegations were not made in the complaint. *Tretola v. Tretola*, No. 2:13-cv-358, 2013 WL 3147958, at *2 n.1 (S.D. Ohio June 19, 2013) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1007 (7th Cir. 1984)).

Secondly, the argument does not overcome the deficiencies in the complaint regarding successor liability. Even if such contractual relationships among Moorer's companies existed, the complaint states no basis for imposing successor liability on GWH for the alleged obligations plaintiffs' direct employers, as was explained above.

Finally, if one considers the third-party beneficiary argument as an alternative theory of recovery against Nomadix (i.e., Nomadix breached an obligation to remit payments to plaintiffs' employers), plaintiffs have nonetheless failed to allege that the parties to the contracts intended that plaintiffs should benefit. *See State ex rel. Atty. Gen. v. Mastergard*, 2016-Ohio-660, ¶ 10, 60 N.E.3d 540, 543 (Ohio Ct. App.) ("Ohio contract law distinguishes between intended third-party beneficiaries and incidental third-party beneficiaries. While an intended third-party beneficiary has enforceable rights under a contract, an incidental third-party beneficiary does not.") (internal quotation marks omitted).

For "an injured third party to qualify as an intended third-party beneficiary . . ., the contract must indicate an intention to benefit that third party." *See Huff v. FirstEnergy Corp.*, 130 Ohio St. 3d

---

[3] Plaintiffs did not name their former employers as defendants in this suit. The complaint does not indicate whether plaintiffs pursued any claims in the bankruptcy proceedings.

196, 202, 957 N.E.2d 3, 8–9 (Ohio 2011); *see also Am. Rock Mechanics, Inc. v. Thermex Energy Corp.*, 80 Ohio App. 3d 53, 58, 608 N.E.2d 830, 833 (Ohio Ct. App. 1992) ("In order for a third person to enforce a promise made for his benefit, it must appear that the contract was made and entered into directly or primarily for the benefit of such third person."). "The mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract is insufficient." *Hill v. Sonitrol of Sw. Ohio, Inc.*, 36 Ohio St. 3d 36, 40, 521 N.E.2d 780, 785 (Ohio 1988).

Plaintiffs do not allege that the contractual arrangements among Nomadix and their direct employers indicated an intent to benefit plaintiffs. They do not assert that their employers had an obligation to use the funds received from Nomadix to pay plaintiffs. Plaintiffs expressly allege that the arrangements were implemented for the benefit of Moorer's companies: "Using, and paying for, shared employees streamlined operations, lowered the overall employment costs of the entities, used specialized knowledge and experience wherever it was found in Defendant Moorer's empire, and contributed to consistency among the entities." Doc. 21 at PAGEID 151. *See Holland v. Levy Premium Foodservice Ltd. P'ship*, 469 Fed. App'x 794, 797 (11th Cir. 2012) (holding that food service employees at sporting event venues were not third-party beneficiaries to their employer's declared policy towards luxury suite patrons that a 20% service charge on all food and beverage orders would be shared among the suite employees, in lieu of the patrons needing to pay tips – the "Policy's stated intent is to benefit patrons").

In a recent decision, the Sixth Circuit applied Ohio law in finding that an agent for a brokerage firm, named Triad, was not an intended third-party beneficiary to a selling agreement between Triad and Ohio National Life Insurance Company. *See Cook v. Ohio Nat'l Life Ins. Co.*, 961 F.3d 850, 856-58 (6th Cir. 2020). The selling agreement included a provision acknowledging that the amounts paid by Ohio National to Triad included fees representing commissions payable to Triad's agents. *Id.* at 853. The court found that the parties to the selling agreement did not intend to make the agent a beneficiary because the provision further stated that Triad bore the sole responsibility for payment of commissions to its agents and because Triad had a separate agreement with plaintiff governing the payment of his commissions. *Id.* at 856 (noting that the payment of commissions to plaintiff was left "solely within Triad's control" and that the selling agreement "does not mandate that Triad remit the commissions it receives from Ohio National for the sale of its annuities to the representatives who sold the annuities").

So too here, plaintiffs make no allegations that their employers were required under the contractual arrangements to remit the funds they received from Nomadix to plaintiffs. *See Joseph v.*

*Hospital Service District No. 2*, 939 So. 2d 1206, 1208-09 (La. 2006) (doctors employed by a medical corporation were not third-party beneficiaries to a contract between the medical corporation and a hospital for the doctors to provide anesthesia services to the hospital – "The doctors were not to be paid by the Hospital. The doctors were not hired by the Hospital. The doctors had no right to demand employment by the Hospital.").

Accordingly, plaintiffs' newly-raised third-party beneficiary theory fails.

**IV.     Conclusion**

For the reasons stated above, the motion to dismiss filed by defendants Nomadix and GWH (doc. 11) is GRANTED. Because plaintiffs have voluntarily dismissed their claims against defendants Moorer and InterTouch Pte, the Clerk of Court shall close this case.

s/ James L. Graham  
JAMES L. GRAHAM  
United States District Judge

DATE: December 17, 2020